FARRAR v. KINGSLEY et al.

(Supreme Court, Equity Term, Cattaraugus County. December, 1910.)

1. PARTNERSHIP (§ 336*)—DISSOLUTION—ACCOUNTING.

In an action for the dissolution of a firm organized to buy shingles to continue until they were sold and for an accounting by a partner intrusted with the duty of purchasing shingles, evidence *held* to show that acts of the partner causing a loss to the firm were a fraud on it, so that he must pay the damages sustained.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 797; Dec. Dig. § 336.*]

2. PRINCIPAL AND AGENT (§ 69*)—LIABILITY OF AGENT.

One who has agreed to purchase chattels for a firm may not make profits by buying the same, and then selling them to the firm at a higher price, and he is liable to the firm for any excess in price charged it.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 130–145; Dec. Dig. § 69.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Melville Farrar against Avery W. Kingsley and others for an accounting and dissolution of a copartnership. Judgment rendered.

Dowd & Quigley, for plaintiff.
George E. Spring and William W. Waring, for defendants.

BROWN, J. In February, 1909, the defendant Nathan R. Williams and one Roswell W. Crosby conceived the plan of forming a copartnership of several business men of Franklinville, N. Y., to purchase a large quantity of shingles, and sell them by the car load to lumber merchants in Western New York and Pennsylvania. Various interviews were had by Williams and Crosby with the plaintiff and the remaining defendants upon the subject and the method to be adopted in managing the financial affairs of the business. It was known to all the parties that Crosby was of no financial responsibility, possessed a questionable character, a low type of a man, but had made something of a success as a salesman of shingles. The defendant Williams was of high financial and business standing, being president of the leading bank of the town, a large landowner, had been a keen observer of men, a capable, shrewd, hard-headed, successful man, with an experience of many years as a drover, buyer, and speculator, enjoying the confidence of the plaintiff and the defendants, some of whom were stockholders and directors of his bank. At the request of Williams, and upon his assurance that the financial affairs of the proposed company would be taken entirely from the hands of Crosby, that Crosby was not to be a member of the company, but was to buy and sell the shingles for the company for one-third of the profits, the plaintiff and the defendants Nathan R. Williams, Avery W. Kingsley, Lewis H. Stilwell, Guy C. Ames, Walter M. Whitcomb, William H. Bates, and W. Scott Baker on the 11th day of February, 1909, entered into a written agreement or article of equal copartnership for the purpose of buying 8,000,000 shingles under the name of Franklinville Shingle Company, and to continue the same until such shingles should be sold. Shortly thereafter, at a meeting of the members of the company, Crosby, who was present, exhibited a telegram from a shingle dealer in Grand Rapids, Mich., to the effect that white cedar, sound-butt shingles could be bought there at $2.20 per thousand; and for the purpose of providing funds to make a purchase of 8,000,000 shingles, and paying $1 per thousand upon the purchase price, the plaintiff, Avery W. Kingsley, Walter M. Whitcomb, William H. Bates, Guy C. Ames, and W. Scott Baker each paid into the Union National Bank the sum of $1,000 to the credit of the shingle company, it being understood by the plaintiff and other members of the company that the defendants Williams and Stilwell were to each pay in a like sum, making a total fund of $8,000. The plaintiff, Bates, Baker and others of the company, expressing their lack of confidence in Crosby, refused to place such fund in his hands to control or manage in such a purchase, whereupon it was determined that the funds of the company, the sum of $8,000, should be placed in the hands of defendant Wil-

liams for the purpose of seeing that the purchase of this large quantity of shingles was honestly made, the moneys properly applied on the purchase price, to the end that the company should surely be protected from all danger of loss by the trickery or suspected dishonesty of Crosby; that while Crosby's services would be of value in making such purchase, on account of his knowledge of values and grades of shingles, he was to accompany defendant Williams to the shingle dealers and aid in making such purchase, in no event was such money to get into his, Crosby's, hands.

The defendant Williams accepted this trust, and apparently undertook its execution. He procured from the bank the $6,000 that had been paid by the plaintiff, Kingsley, Whitcomb, Bates, Ames, and Baker in the shape of three New York drafts, one for $2,000, dated February 17, 1909, one for $1,000, dated February 17, 1909, and one for $3,000, dated February 18, 1909, each payable to his order, and on the 20th of February, 1909, in company with Crosby, left Franklinville for Grand Rapids.

It is contended by defendant Williams that he also took with him $1,530 in currency to be used, together with a check for $470 that might be given as and for the share of himself and defendant Stilwell, in the cash payment of the purchase price of any shingles that might be bought. While the defendant Williams and Crosby were in Grand Rapids 8,000,000 shingles were purchased, and they returned to Franklinville; the defendant Williams reporting to the plaintiff, Bates, and Whitcomb that he had bought from a dealer named Smith 5,000,000 shingles and from Tucker & Harper Lumber Company 3,000,000 shingles for $2.20 a thousand, that at first these dealers did not want to sell to him because he was not a jobber, but that he went to a bank in Grand Rapids, cashed his drafts, and planked the $8,000 right down to these dealers, and that he got the shingles. The understanding of all the parties was that the balance of the purchase price of the shingles was to be paid as fast as the shingles were shipped to various merchants on sales made by Crosby. After Crosby's return to Franklinville, he entered upon the business of selling these shingles; orders were procured; several car loads shipped by the Grand Rapids dealers to fill these orders. Substantially all shingles shipped to merchants to whom Crosby had made sales were refused, owing to their poor quality. Crosby, assuming to act for the shingle company, and the company itself, through its treasurer, the cashier of the Union National Bank, adjusted all such claims upon a basis of about $1.50 a thousand. Shortly thereafter the defendant Williams sold all his interest in the 8,000,000 shingles to the defendant Ira M. Godfrey, receiving therefor a stock of groceries valued at $2,000. The fact of this transfer of interest and the constant trouble with the quality of the shingles resulted on the 5th of May in the plaintiff and Bates, Baker and others calling on the defendant Williams for an explanation and asking for the papers and documents by which the 8,000,000 shingles were bought of the Grand Rapids people. Whereupon the defendant Williams then for the first time after his return from Grand Rapids produced and exhibited docu-"

ments showing on their face that the Grand Rapids dealers had sold the 8,000,000 shingles to Crosby by a paper that did not state the consideration or amount per thousand that Crosby paid, and that Crosby by independent contracts had sold to the defendant Williams, as agent for Franklinville Shingle Company, 6,000,000 shingles for $2.20 per thousand, that Crosby had sold to the firm of Stilwell & Williams 2,000,000 shingles at $2.20 per thousand, and that Stilwell & Williams had sold to the Franklinville Shingle Company 2,000,000 shingles at $2.50 per thousand at Rochester rate of freight, the sale at $2.20 per thousand being based on Green Bay, Wis., rate of freight, which was the first information that the plaintiff, Bates and Baker had that the 8,000,000 shingles had been purchased from Crosby. The plaintiff, not being satisfied with the appearance of the deal, as revealed by these papers, and the situation as to the poor quality of the shingles, went to Grand Rapids, and there learned that 3,000,000 of the 8,000,000 shingles had been sold by the Tucker & Harper Lumber Company to Crosby for $1.50 per thousand, Crosby paying $900 down on the purchase, being 30 cents per thousand, leaving $1.20 per thousand to be paid as the 3,000,000 or any part thereof should be shipped. The plaintiff also learned that 5,000,000 shingles had been sold by one Frank P. Smith to Crosby for $1.40 per thousand, Crosby paying $1,000, or 20 cents per thousand, on the purchase, leaving $1.20 to be paid when shingles were shipped; that neither the Tucker-Harper people nor Smith knew of defendant Williams being concerned in such purchase beyond the fact that he had guaranteed to one of the sellers the fulfillment of the Crosby contract with him, which was the first information that plaintiff had that any of the shingle company's money had gone into the hands of Crosby. With this information, the plaintiff returned to Franklinville, and boldly charged that the defendant Williams had cheated and defrauded the shingle company out of the sum of $6,100, the difference between the sum claimed to have been paid down at the rate of $2.20, and that actually paid at the rate of $1.50 for 3,000,000 and $1.40 for 5,000,000 shingles. It then was discovered that at the time of the formation of the company Crosby had entered into a secret agreement with the defendant Whitcomb whereby Crosby was to furnish one-half the moneys to be paid in by Whitcomb and was to be one-half owner of Whitcomb's share in the company; that Crosby claimed he had paid one-half of such original contribution, viz., $500, to Whitcomb, which, however, Whitcomb denies was ever paid to him, and now claims that Crosby is owing him that sum. The defendant Ames having sold his interest in the 8,000,000 shingles to defendant Willard, the plaintiff brought this action for a dissolution of the copartnership, and that the defendants Williams and Crosby be compelled to account for the $6,100, out of which the shingle company has been defrauded. The position of the defendant Williams upon the trial is that he paid to Crosby at Grand Rapids the sum of $8,000 upon the purchase price of 8,000,000 shingles at $2.20 per thousand in the honest belief that Crosby was paying that price to the Tucker & Harper Lumber Company and Frank P. Smith, that such price was

the fair market price for such shingles, and that Crosby fooled, misled, deceived, and practically buncoed him out of the sum of $6,100; that he did not participate in the benefits accruing to Crosby by such deceit, and is not liable to account therefor to the shingle company.

The position of Crosby is that he was not a member or agent of the copartnership, that he had a right to fool the company and the defendant Williams into believing that the market price of such shingles was $2.20 per thousand, to buy them as cheap as he could and unload them onto Williams at $2.20 and take the profits; that he in fact tricked Williams into believing that he, Crosby, was in fact paying $2.20 per thousand, and by clever manipulation of events and facts induced Williams to deliver to him the whole $8,000, and because he so successfully accomplished his design of quieting Williams' well-known suspicion, and numbing his senses, that Williams cannot be charged with wrongdoing.

In view of the keen, shrewd, masterful mind, and strong personality of the defendant Williams, his knowledge of the unreliable, tricky Crosby, it is incredible that he was made an innocent victim of Crosby's scheme to defraud; and, before the story of Williams can be accepted by reasonable men as a satisfactory explanation of the loss of $6,100 intrusted to him by his business associates, each item and circumstance of the tale ought to be carefully examined, weighed, and analyzed.

Williams testifies that on the 22d day of February, 1909, he, in company with Crosby, went to the office of the Harper & Tucker Lumber Company, in Grand Rapids, met Mr. Henry Harper of that firm, and bargained for 3,000,000 shingles to be purchased by himself at $2.20 per thousand, that he, Williams, was to buy the shingles. Henry Harper testifies that at this conversation he had no dealings with Williams whatever. Williams testified that on the morning of February 23, 1909, Harper and his clerk, William H. Rawson, came to the hotel where Williams and Crosby were stopping, and Harper refused to sell the shingles to Williams for $2.20 per thousand, alleging as a reason that Williams was not a jobber or dealer in shingles at wholesale; that they must have 10 cents more a thousand, and that Crosby suggested that the sale be made to him, Crosby, and he would turn them over to Williams; that Crosby was a jobber, and that objection did not exist as to him. Williams further testifies that he thereupon stated to Crosby that he, Williams, would not do anything of the kind; that Harper and Rawson left the hotel, and Williams stated to Crosby:

"I didn't like to buy shingles in that way. I wanted to buy direct from them, as I agreed, and have it all straight; and I didn't know what the boys would say about it when we come home with that kind of shift."

On the 14th day of August, 1909, the defendant Williams stated in an affidavit that it was originally understood when the shingle company was formed that the shingles were to be purchased from Crosby; that that was the expectation and intention of all the parties to the partnership agreement. By the testimony of Williams on this trial as to the conversation with Harper on the morning of February 23, 1909, it is apparent that that time was the first he ever heard of the sug-

:gestion that the shingles be bought from Crosby. The fact is that on the evening of February 22, 1909, there was prepared in the office of the Harper Lumber Company, by William H. Rawson, at the dictation of Crosby, in the presence of Williams, a bill of sale of 3,000,000 shingles by Crosby to Williams as agent for the shingle company. It is impossible to reconcile the testimony of defendant Williams that the first intimation he had that he was to buy of Crosby was on the 23d of February, with the statement in his affidavit and the preparation of the Crosby-Williams contract on the 22d of February.

The fact that defendant Williams exchanged the drafts for currency is of such significance that some other explanation of that act than that given by Williams must be presented before it can convince the ordinary mind of its verity. Williams testifies that on the morning of the 23d, at his hotel, Crosby suggested that, as the dealers in Grand Rapids would not sell to Williams because he was not a jobber, it would be better to go to the mills in Northern Michigan and buy direct of them; that, to do this, cash would be needed, as no banks could be found near the mills to make payments. Williams then says that they went to Harper's office, had another talk with him, and then they finally decided that they would take the 3,000,000 shingles in that way through Crosby; that after the contract between Harper and Crosby for the sale to Crosby of the 3,000,000 shingles had been agreed upon, but before the contract had been signed, and after he, Williams, had learned that Smith would sell 5,000,000 shingles, that he, Williams, Crosby, and Harper went to the bank and obtained the currency on the drafts. If it is true that Harper had agreed to sell to Crosby the 3,000,000 shingles, and Smith had agreed to sell to Crosby the 5,000,000 shingles, and Williams knew of this, then there was no necessity of going to Northern Michigan shingle mills to make the purchase, and the excuse of needing the money for such a purpose falls to the ground. There was therefore no possible excuse for Williams getting the currency; at least, there has been no excuse of any merit given by him. The bare fact that Williams did get $5,000 in currency on these drafts, with no necessity therefor, certainly calls upon him to give an explanation of some sort that will not permit of the inference that its tracing through the intricacies of these mysterious deals would be quite difficult, if not impossible, and Williams' connection with each step more doubtful of proof if currency were used, rather than the drafts. It is certain that the drafts were not cashed for the purpose of buying shingles at various shingle mills in Northern Michigan, for the reason that before cashing the drafts Williams and Crosby had bargained for 3,000,000 from Harper & Tucker Lumber Company, and Williams knew that Smith could and would sell Crosby 5,000,000 shingles. There is something very mysterious about these drafts. They are payable to Williams' order, indorsed by Williams. If Williams got them cashed, that was the only indorsement needed. By simply indorsing them, he then became entitled to the money from the bank. The fact is they are also indorsed by Crosby as second indorser. What possible purpose there could be of having Crosby indorse them after Williams' indorsement does not appear. From the

fact of Crosby's indorsement, the apparent transaction was the indorsement of the drafts by Williams and the delivery of them to Crosby, the indorsement by Crosby, and the delivery of them by Crosby to the bank, and the payment by the bank of $5,000 to Crosby. The fact is that the bank paid the money to Williams, and Williams claims that he took the $5,000 to Smith's house and there paid it to Crosby. No testimony was offered as to why Crosby indorsed these drafts. In the absence of such testimony, the inference is irresistible that the defendant Williams is called upon to give some explanation as to the necessity of doing such an unusual thing as cashing these drafts other than the suggestion as to buying shingles in Northern Michigan. The bare fact that the drafts were indorsed over to Crosby by Williams and delivered to him would determine Williams' breach of trust, assuming he undertook for plaintiff and others of the shingle company to see to it that Crosby did not get hold of these funds.

Williams testifies that, taking $5,000 in currency in a satchel, on the afternoon of the 23d, he, in company with Crosby, went to the Smith residence, Crosby having informed him that Smith would sell 5,000,000 shingles, met Mr. Smith in his sitting room; that Crosby had the contracts with him, Crosby saying that they had come down to complete the deal, Mr. Smith saying "All right." Mr. Smith signed one contract selling to Crosby 3,000,000 shingles and one contract selling to Crosby 2,000,000 shingles. Williams asked Smith if they were all right, Smith replying, "Yes, sir;" and then Williams read them over and signed two contracts, one from Crosby to Williams, selling 3,000,000, and one contract from Crosby selling to Stilwell & Williams 2,000,000, shingles. Just as the contracts were signed Smith said, "Excuse me a minute," and he, Smith, went into the other room, and then Williams paid to Crosby $5,000. Crosby took the money and went into the other room where Smith was. Crosby returned and said: "Everything is all right." Williams said: "Is everything all right, Mr. Smith?" And he says, "Yes, sir; all right," and Williams bade Smith goodby, and started to go. Crosby says, "Just a minute," and Williams stopped. Crosby went in where Smith was and came out in half a minute, and Crosby said, "Can't I borrow your satchel for a few minutes? Mr. Smith wants I should go with his wife to bank the money. I will meet you at the hotel." And Williams went out and left Crosby at Smith's. Williams returned to the hotel, and after half or three-quarters of an hour Crosby reached the hotel, and they both went to the office of the Harper & Tucker Lumber Company.

It is evident that, in order to honestly believe that there was no trickery being imposed upon him by Crosby, it was necessary for Williams to know that this large sum of money actually reached the hands of Smith, and, if it were true that Williams did in fact pay this money to Crosby at the Smith residence, as related by him in the testimony, it might be said that he was simply the victim of a clever sleight of hand performance by Crosby, who pretended to pay it over to Smith for the simple purpose of making Williams believe that he was actually doing so. The narrative, however, loses its force when

the testimony of Mr. and Mrs. Smith is recalled. They both state that Williams and Crosby were not together on the afternoon of the 23d at Smith's house, that they were there together on the 22d, and in the forenoon of the 23d, but at the time the money was paid to Smith at his house Crosby came alone.

Mr. Smith says that Williams was not at his house at the time Crosby paid him the sum of $1,000 to apply on the contract for 5,000,000 shingles; that Crosby came alone with a satchel, paid the money in currency, took the contracts and left in a few minutes; that he, Smith, never asked Crosby to go with his wife to bank the money; that he never asked Crosby to borrow a satchel to take money to the bank; that the money was paid to him on the 23d after banking hours; that his wife was somewhat vexed at having the money paid to him too late to get it into a bank that day, and he was obliged to keep it in the house overnight. Mrs. Smith testifies that she was sitting at the sewing machine in the dining room in which their telephone is located during the time Crosby was with her husband and paying him the $1,000; that her husband did not come into the dining room, followed by Crosby, and that Crosby did not pay her husband in the dining room; that Crosby was alone with her husband at the time the payment was made; that Williams was not present; that the payment was made after 3 o'clock on the afternoon of the 23d; that it was after banking hours; and that the $1,000 was not taken to the bank that day in a satchel furnished by Crosby.

From the testimony of Williams, Crosby, Frank P. Smith, and Mrs. Smith the conclusion is reached that Williams and Crosby were at Smith's house together in the afternoon of the 22d and in the forenoon of the 23d; that the contracts were not signed at Smith's house, and the money paid him in the forenoon of the 23d; that the contracts were delivered in the afternoon of the 23d and the $1,000 paid to Smith by Crosby at that time; that Williams was not at the Smith house in the afternoon of the 23d when the money was paid to Smith; that Crosby did not ask Williams for his satchel to be used by the Smiths in taking the money to a bank that afternoon; that Williams did not take the $5,000 to Smith's residence on the afternoon of the 23d.

If it be true, as alleged in the answer of defendant Williams, that it was the purpose, agreement, and intention of all the members of the shingle company that the shingles should be purchased from Crosby at $2.20 per thousand at the time the company was formed, then it is entirely immaterial whether Williams was present when Crosby paid Smith the $1,000, for with the arrangement between Smith and Crosby Williams had nothing to do, and was in no wise concerned therewith. The allegation of the answer of Williams is in entire harmony with the version of the transaction at the Smith residence on the afternoon of the 23d as detailed by Mr. and Mrs. Smith. It is only upon the theory that the allegation in the answer is incorrect that it becomes important for Williams to establish that he exercised due care and caution in seeing that the money was actually paid to Smith. The defendant Williams moved at the close of

all the evidence to amend his answer in this particular. The mind is not satisfied with the sufficiency of the explanation given by Williams as to why he paid this large sum of money to Crosby. It may be true that Crosby successfully fooled, tricked, and deceived Williams into paying this $5,000 to him, Crosby, but it is as certain as any fact can be proved by indirect evidence that such fooling, tricking, and deceit, if practiced at all, was executed in some other manner than by the claimed transaction at Smith's house. If the story as detailed by Williams as to the manner of paying the $5,000 over to Crosby be accepted as a rational, sensible explanation of how Crosby fooled and tricked him, it is impossible to see how Williams could innocently allow himself to be again fooled in the same, but more bald, manner on the same day by the transaction at the office of Harper & Tucker Lumber Company. It might do to believe that Williams was an innocent victim at Smith's (if he was there), but his version of the transaction at the office of Harper & Tucker Lumber Company 30 minutes after the Smith experience makes one or the other unbelievable.

Williams testifies that, after Harper left the hotel on the morning of the 23d, Williams and Crosby went to Harper's office, had another talk with him, and finally decided to take the 3,000,000 shingles through Crosby; that the drafts were cashed; that later in the day in the afternoon he, Williams, and Crosby went to Smith's residence, after which Williams and Crosby met at the hotel, and together they went to the office of Harper & Tucker Lumber Company; that the contract between the Harper & Tucker Lumber Company and Crosby was there prepared; that Crosby had the contract whereby Crosby sold to Williams, as agent for the shingle company; that he, Williams, read both contracts over, and then asked Harper before the contracts were signed, "I asked him if this was all straight and right, the purchase price was all straight and right, the same as I was to have them from him;" that Harper replied that it was; that thereupon the papers were signed, Harper going into another room; that he, Williams, thereupon paid to Crosby $3,000 by delivering to him a draft for $1,000, $1,530 in currency and agreeing to pay Crosby's check on Franklinville bank for $470; that Crosby took the draft, currency, and check and went into the room where Harper was, and that Harper soon came out and asked Williams to guarantee the fulfillment of Crosby's contract with the lumber company, which Williams did by signing such guaranty. Williams also stated that he did not see Crosby pay any money to Harper.

The witness Rawson has no recollection of seeing Williams pay any money to Crosby in the office of Harper & Tucker Lumber Company on February 23, 1909. The witness Harper states that he did not see Williams pay any money to Crosby in his office on that day; that he did not see any currency in the possession of Crosby; that Crosby gave him, Harper, a draft for $1,000, a check for $470, and that he, Harper, returned to Crosby his, Harper's, check for $570, making a net payment by Crosby to Harper of $900. The fact is that the contract from Harper & Tucker Lumber Company to Crosby

is silent as to the consideration per thousand that Crosby was to pay for the shingles. Williams had his suspicions aroused sufficiently to ask Harper if the contract was straight and right as to the purchase price, yet did not deem it important that the contract should state what the purchase price was. Williams guaranteed the performance of the contract on the part of Crosby, and it is very significant that he should do this in complete innocence of any fraud as to the purchase price of the shingles, especially in view of the fact that the contract from Harper & Tucker Lumber Company to Crosby and from Crosby to him, Williams, were both read simultaneously before signing. The fact, as claimed by Williams, that within an hour Crosby had succeeded in putting off onto him, Williams, the Smith contract at Smith's house, which contract also concealed the consideration Crosby was paying for the 5,000,000 shingles, and the payment by Williams of $5,000 in currency under very peculiar circumstances, would seem to call upon Williams to exercise some more care and diligence in looking out for Crosby's tricks than his story as to transactions in Harper & Tucker Lumber Company's office discloses. It is impossible to see how Williams could have acted in good faith and innocently in dealing with the known trickster Crosby in the manner detailed by him.

Some time between 9 and 10 o'clock on the morning of February 22, 1909, Williams, in company with Crosby, visited the residence of Frank P. Smith, met Mr. Smith, and Williams testifies that they talked about buying 3,000,000 to 5,000,000 shingles; asked about the price, and Crosby told Williams $2.20, and Smith made no reply. Williams remarked that that was a pretty good price, but that he supposed they would have to stand it, to which Smith made no reply. Crosby then told Williams that Mr. Smith did not sell to him, Williams, and Mr. Smith made the remark, "That is right." Crosby says: "He can't sell them to you because you are not a jobber." And Mr. Smith said: "That is right." Smith said he could sell 3,000,000, but could not say positively whether he could sell 5,000,-000 or not. Williams and Crosby then left the Smith residence, and Williams did not see Smith again until the 23d. On the evening of February 22d the stenographer at the hotel where Williams and Crosby were staying prepared four contracts at Crosby's dictation in the presence of Williams. One contract was from Frank P. Smith to Crosby selling 3,000,000 shingles, one contract from Frank P. Smith to Crosby selling 2,000,000 shingles, one contract from Crosby to Stilwell & Williams selling 2,000,000 shingles, and one contract from Crosby to Williams selling 3,000,000 shingles.

It is therefore apparent that Williams knew on the 22d of February that he was not intending to buy any shingles from either Tucker & Harper Lumber Company or Frank P. Smith, but that he was going to buy the shingles from Crosby, and that when he testified to his surprise on the morning of the 23d on being told by Crosby, in the presence of Harper and Rawson, that Harper would not sell to him, Williams, because he was not a jobber, there was no occasion for such surprise; and when Williams on the morning of the

126 N.Y.S.—38

23d, on being told that Harper would not sell to him, but would to Crosby and Crosby could sell to Williams, expressed some doubt as to what the boys would say when they reached home with that kind of a shift, it is certain that the preparation of the contracts on the evening of the 22d and the talk at Smith's on the afternoon of the 22d afforded quite as cogent reasons for apprehending trouble about the shift of responsibility for the honest and faithful trust he had undertaken to perform. It is very clear that Williams knew on the evening of the 22d that the Grand Rapids program was to be executed by sales to Crosby and from Crosby to himself. He then knew that he was not to be a party to the contracts as to the selling price from the Grand Rapids dealers to Crosby, and that Crosby was to be at liberty to make any contract he could for his own benefit and to the injury of the shingle company, the very precise situation that the defendant Williams had undertaken to prevent for and on behalf of the plaintiff and the other members of the shingle company. With this situation in mind, it is clearly apparent that Williams intentionally permitted Crosby to carry out his scheme to defraud by the performance at Harper & Tucker Lumber Company's office and at the residence of Smith, or that he was a participant therein.

Williams testifies that he was not permitted to buy from Harper & Tucker Lumber Company, for the reason that he, Williams, was not a jobber. The contracts between Harper & Tucker Lumber Company and Crosby and between Crosby and Williams were executed at Harper & Tucker Lumber Company's office on the 23d of February, at about 4 o'clock in the afternoon. This was after Williams had purchased 5,000,000 shingles from Crosby that had been sold to Crosby by Smith. It is absolutely certain that, after such purchase from Crosby by Williams, no such excuse could have prevented Harper & Tucker Lumber Company from selling to Williams. Williams was a jobber then. He had 5,000,000 shingles on hand to be sold to the trade in car load lots. It is very significant that, when Williams reached Harper & Tucker Lumber Company's office at 4 p. m. on February 23d, he made no mention of the fact that he had qualified himself to comply with the technical objection interposed by Harper earlier in the day by becoming a jobber. It would seem to the ordinary mind that Williams did not care to reveal his newly acquired qualifications to Harper. It is very clear that if Williams had purchased direct from Harper & Tucker Lumber Company, and paid $1.50 per thousand, he would become directly accountable for the difference of 70 cents a thousand; or, if he paid $2.20 a thousand, there would be no profit. It is certain that the failure of Williams to reveal the fact of his being a jobber permitted Crosby to carry his fraudulent scheme into execution, and Williams' astute, active, careful business training and experience will not admit of any conclusion other than that he purposely failed to exercise his intelligence.

It is incredible that a man of such business experience and acumen would go to Grand Rapids to purchase 8,000,000 shingles involving the expenditure of over $16,000, and make no intelligent or reason-

able inquiry as to what the market price of shingles was. Williams testifies that he was told by Harper that $2.20 was the price. This is denied by Harper, who says that Williams never asked him what the market price of shingles was; that he had no dealings whatever with Williams; that Williams never asked him, Harper, to sell shingles to him. Williams testifies that Crosby told him, in the presence of Smith, that $2.20 was the price, and that some man whom he does not name told the same thing. Crosby testifies that he asked one C. C. Follmer to tell Williams that the market price of shingles was $2.20 per thousand, and it is assumed that Follmer is the unknown man with whom Williams talked. C. C. Follmer is called as a witness, and he states that Crosby never asked him to state to Williams the market price; that he did not state the market price to Williams; that he never saw Crosby in Grand Rapids, and does not know him. With such evidence as this how can it be believed that Williams made any sensible or reasonable attempt to learn the market price of shingles. The proof is that the market price then in Grand Rapids was $1.40 to $1.50 per thousand, and any intelligent inquiry by Williams would have revealed that fact. It was the duty of Williams to make more of an inquiry than he states he did make. He went to Grand Rapids for the very purpose of preventing Crosby from fooling and cheating the Franklinville Shingle Company. His explanation as to why he did not prevent such fraud does not explain. His story in the light of his capacity and mental equipment is inconceivable, and, as has been said of other like stories, is almost false as a matter of law.

The sum of $6,100 has been lost to the Franklinville Shingle Company by reason of the transaction willfully committed and knowingly permitted by the defendant Williams. His acts constitute a fraud upon that company, and he must respond in damages for the injury sustained. The defendant Crosby having agreed to buy the shingles for the shingle company, his profits on the purchase of the shingles became the property of the company. He is equally liable to the company with the defendant Williams. However, this being an action for an accounting, it is not thought that a recovery can be had in this action against him. Judgment is awarded continuing the temporary receivership of the plaintiff and appointing him permanent receiver of the Franklinville Shingle Company upon his giving a bond in the sum of $10,000 to be approved by a Justice of this court; that the defendant Nathan R. Williams pay to such receiver within 30 days after the entry of this judgment the sum of $6,100 with interest thereon from the 23d day of February, 1909, or, in default thereof, the plaintiff's attorneys may issue execution therefor in favor of such receiver; that such receiver disburse such fund upon receipt thereof by paying the same pro rata to the original members of such company or their successors as their interests may appear. Upon the coming in of the report of such receiver and its confirmation, judgment may be entered dissolving the Franklinville Shingle Company.

This being a difficult and extraordinary action, an extra allowance

of 5 per cent. costs, together with taxable costs, are awarded to plaintiff against the defendant Nathan R. Williams.

Let findings be prepared.